**Tamara VALLIER, et al., Plaintiffs,**

v.

**JET PROPULSION LABORATORY; California Institute of Technology; United States of America, Defendants.**

**No. CV 97–01171 CAS.**

United States District Court, C.D. California, Western Division.

Aug. 2, 2000.

888

and conditions.

Clifford H. Pearson, Wasserman Comden & Casselman, Tarzana, CA, Stan Blumenfeld, Gordon E. Krischer, James R. Asperger, O'Melveny & Myers, Thomas V. Girardi, Girardi & Keese, Los Angeles, CA, for Plaintiffs.

Stan Blumenfeld, Gordon E. Krischer, James R. Asperger, O'Melveny & Myers, Gwendolyn Millicent Gamble, Nora M. Manella, Asst. U.S. Attorney, Office of U.S. Attorney Civil Div., Los Angeles, CA, J. Patrick Glynn, Department of Justice Civil Division, Washington, DC, David S. Fishback, Steven Talson, Department of Justice Civil Division, Washington, DC, for Defendants.

**ORDER DENYING CALIFORNIA INSTITUTE OF TECHNOLOGY'S PETITION FOR CERTIFICATION AND GRANTING UNITED STATES' MOTION FOR SUMMARY JUDGMENT**

SNYDER, District Judge.

## I. INTRODUCTION

Plaintiffs [1] filed this action against defendant and third-party plaintiff Jet Propulsion Laboratory ("JPL"), and defendant California Institute of Technology ("Caltech") on January 10, 1997 in Los Angeles County Superior Court. Thereafter, Caltech filed a third party claim against the United States that is described below. On February 24, 1997, Caltech removed this action to this Court pursuant to 28 U.S.C. §§ 1331, 1441, 1442, and 2679.

## II. PROCEDURAL HISTORY

Caltech, which operates JPL, filed its third-party complaint for indemnity and declaratory relief against the United States under the Federal Torts Claims Act ("FTCA").[2] The third-party complaint alleges four claims for relief: (1) comparative equitable indemnity (proximate cause); (2) comparative equitable indemnity (vicarious liability); (3) implied contractual indemnity; and (4) declaratory relief.

On December 24, 1997, following removal of this action to this Court, the United States filed a motion to dismiss Caltech's claims pursuant to Fed.R.Civ.P. 12(b)(1) or, in the alternative, for summary judgment, based upon its defense of governmental immunity. On February 17, 1998, Caltech filed a motion pursuant to Fed. R.Civ.P. 56(f) seeking deferral of consider-

---

**1.** Plaintiffs are Tamara Vallier; Ramona Higley; Anita Salvo as representative of the Estate of Francesca Salvo; Dennis Adams; Jill Bauman; Cathy Ellis; Kristen Espenscheid; Jonathan Espenscheid; Peter Joseph Haring; James Hill, Jacqueline Ellis, and Cathy Ellis as representatives of the Estate of Mary Hill; Pam McVay; Laura Ofer, Michael Ofer, Pamela Ofer Knox, and Kelly Ofer as representatives of the Estate of William Ofer; Erik Wood; Rick Meyers; Francis Brooks; Francis Brooks as representative of the Estate of Oscar Brooks; Janet Tenney, Jack Carson Tenney, and Max Patrick Tenney as representatives of the Estate of Patrick Tenney; Merle Warren as representative of the Estate of Gerard Peters; John Wilcox; James Jones; Katherine Anderson as representative of the Estate of Daniel Anderson; Michael Harris; Fred Engler; Stephen Saylor; Scott Farrell; Malcolm Clement, and Stanley Clement as representatives of Estate of Frances Clement; Olga Chestang as representative of the Estate of Charles Chestang; Mary Mix as representative of the Estate of John Mix; Betty Barr as representative of the Estate of Earl Barr; Garland Morris, Michael Morris, and Tama Germain as representative of the Pearl Morris; Dorothy Kimbell, Terrence Morgan Kim-

bell, Blair Marie Kimbell, and Jennifer Kimbell as representative of the Estate of Vincent Kimbell; Matt Lasky; Denise Bickerstaff; Roxanna Bickerstaff; Ruth Bickerstaff; Dinoe Burns, Jonnelle Summervilles, and Eric Burns as representatives of the Estate of Beverly Burns; Robert Cunningham; Shirley Fisher; Shirley Ganther; Judith Shoji; Cheree Brack, and Philip Georgiades II as representatives of the Estate of Philip Georgiades I; Edna Hudson; Terry King; Tim Ray; Emma Smith; Carlton Spencer; Elonte Dominick Vaughn; Carolyn Verheyen; William Schaff; Beverly L. Lewis, and Donald E. Lewis as representatives of the Estate of Carol Lewis; Beatrice Stubblefield, and Elmo Stubblefield as representatives of the Estate of Dana Stubblefield; Sylvia Smiley as representative of the Estate of Leroy Smiley; and, John Scroggins; George Moore; and Barbara Silcott and Glenn Silcott as representatives of the Estate of Amy Silcott.

A related case, *Cunningham v. United States*, No. CV 98–5365–CAS, involves different plaintiffs but similar claims for relief.

**2.** JPL is owned by the United States under the sponsorship of the National Aeronautics and Space Administration ("NASA").

ation of the government's motion until such time as further discovery could be conducted.

Thereafter, on April 17, 1998, plaintiffs filed the Second Amended Complaint against Caltech and the United States. By order dated April 20, 1998, the Court granted in part Caltech's Rule 56(f) motion, providing the parties additional time to conduct discovery relevant to the United States' claim of governmental immunity. On July 10, 1998, the United States filed a motion to dismiss plaintiffs' claims pursuant to Fed.R.Civ.P. 12(b)(1) or, in the alternative, for summary judgment. The parties thereafter stipulated to have this motion heard concurrently with the United States' motion to dismiss or for summary judgment with regard to Caltech's claims.

Plaintiffs filed the Third Amended Complaint ("TAC") against Caltech and the United States on December 14, 1998. The TAC alleges claims for: (1) battery; (2) wrongful death; (3) survival action; (4) negligence; (5) strict liability; (6) intentional infliction of emotional distress; (7) negligent infliction of emotional distress; and (8) public nuisance against all defendants.

On April 30, 1999, Caltech filed a Motion to Estop the Government from Denying Extensive Supervision and Control over JPL Facilities. Also on April 30, 1999, Caltech filed a Petition for certification as a government employee pursuant to 28 U.S.C. § 2679(d). On May 3, 1999, the government renoticed its motions to dismiss or for summary judgment against plaintiffs and Caltech.

On August 13, 1999, the parties presented oral argument on all three pending motions, i.e., Caltech's motion to estop, Caltech's petition for certification, and the United States' motion to dismiss or for summary judgment. Following oral argument, these motions were taken under submission to enable the Court to consider the voluminous record presented by the parties. By order dated August 18, 1999, the Court denied Caltech's motion to estop. Because the jurisdictional issues in this case involve consideration of evidentiary materials going beyond the face of the pleadings, the Court finds the government's motion appropriate for decision on summary judgment. *See, e.g., Redmon By and Through Redmon v. United States,* 934 F.2d 1151 (10th Cir.1991). Moreover, at the August 13, 1999 hearing, the parties stipulated that the Court should treat the motion to dismiss as one for summary judgment pursuant to Fed.R.Civ.P. 56. The parties further stipulated at the August 18, 1999 hearing that Caltech's petition for certification should be decided on the record before the Court without further evidentiary hearings or trial.

## III. BACKGROUND FACTS

JPL is a research and development facility located on 176 acres in Pasadena, California. United States Appendix, p. 1.[3] JPL is presently owned by the United States, under sponsorship by NASA, and operated by Caltech. *Id.;* Caltech Appendix, Exh. 24, pp. 1165–66.[4] Since its inception, JPL has performed research and development in aeronautics, space technology and space transportation. U.S.App., pp. 37, 78, 304–08. Since 1959, JPL has been designated as a federally funded research and development center ("FFRDC") as defined in 41 U.S.C. § 405(a), 48 C.F.R. § 35.017, and Federal Acquisition Regulation ("FAR") § 35.017. Caltech App., Exh.

---

**3.** The United States has submitted an extensive appendix in support of its motion to dismiss or, alternatively, for summary judgment, and in opposition to Caltech's petition for certification. In this Order the Court refers to the United States' appendix as "U.S.App.", with pages numbers indicated where appropriate.

**4.** Caltech also has submitted a comprehensive appendix in support of its petition for certification and in opposition to the United States motion for to dismiss or, alternatively, for summary judgment. The Court refers to Caltech's appendix as "Caltech App.", with page number indicated where appropriate.

24, p. 1165. FAR § 35.017(a)(2) defines the role of an FFRDC as follows: "FFRDC's enable agencies to use private sector resources to accomplish tasks that are integral to the mission and operation of the sponsoring agency." *Id.*

JPL began as a privately-funded facility testing rocket engines in 1936.[5] Caltech App., Exh. 1, pp. 12–13; U.S.App., p. 2. In 1939, shortly after the outbreak of World War II, the United States Army Air Corps became interested in JPL's rocket research and decided to sponsor military research contracts at JPL. Caltech App., Exh. 1, p. 18, Exh. 9, pp. 434–436; U.S.App., pp. 2, 24. Thereafter, the Army Ordnance Department took over the role of sponsoring military research at JPL. Caltech App., Exh. 9, pp. 446–450; U.S.App., pp. 2–3. On June 22, 1944, Caltech and the Army Ordnance Department entered into Letter Order Contract No. W–04–200–Ord–455, an agreement to execute a contract for the research and development of rocket missile and launching equipment. Caltech App., Exh. 9, p. 447, Exh. 11, pp. 501–03; U.S.App. p. 248. The terms of that contract are contained in Supplement No. 9 to the Letter Order, entered into on January 15, 1945. Caltech App., Exh. 11, pp. 525–569; U.S.App., 249–251. Pursuant to the terms of Supplement No. 9, Caltech agreed to provide scientific, technical, engineering and other personnel, labor and services for the management and operation of JPL. *Id.;* U.S.App., pp. 79, 249–251.

Caltech remained under contract with the Army to operate JPL until January 1, 1959. At that time, NASA succeeded to ownership of JPL, and JPL's mission changed from weapons development to space exploration. Caltech App., Exh. 20, pp. 1072–73; U.S.App., pp. 27–30, 79. Despite the transfer of ownership of JPL, Caltech remained under contract with the Army, and NASA administered the contracts. In 1961, NASA initiated its own new contract with Caltech.[6] This contract between Caltech and NASA has been renewed periodically since 1961. U.S.App., p. 38.

## IV. EVIDENTIARY OBJECTIONS

Caltech has raised evidentiary objections to certain evidence submitted by the United States and by plaintiffs in conjunction with the United States' present motions. Similarly, plaintiffs have objected to certain evidence submitted by Caltech and the United States. Because this Court does not rely on the specific evidence objected to in rendering its decision herein, it does not deem it necessary to address these objections in this order. Furthermore, plaintiffs object to the evidentiary appendices submitted by Caltech and the United States in connection with the reply briefs supporting their respective motions, as being beyond the scope of those motions in violation of Local Rule 6.2. The Court, however, declines to exercise its discretion to strike these appendices, which appear to be supplemental and explanatory of the government's and Caltech's respective positions set forth in their moving papers.

## V. PETITION FOR CERTIFICATION

Caltech seeks certification as a government employee pursuant to 28 U.S.C. § 2679(d)(3). The United States and plaintiffs oppose the petition, claiming that Caltech does not qualify as a government employee but, rather, is an independent contractor. It is thus apparent that plaintiffs do not seek to hold the government liable for any conduct allegedly done by Caltech.

---

5. In the early years, JPL was known as the Guggenheim Aeronautical Laboratory ("GAL"). For purposes of this order, the term "JPL" includes GAL.

6. The period from 1939 through 1961, during which Caltech contracted with the Army to operate JPL, is referred to herein as the "Army years," and includes the period from 1959 to 1961, when NASA owned JPL and administered the Army–Caltech contracts.

## A. Standard for Certification

■ A party may bring a suit against the federal government only to the extent that the government waives its sovereign immunity. *United States v. Orleans,* 425 U.S. 807, 814, 96 S.Ct. 1971, 48 L.Ed.2d 390 (1976). The FTCA waives sovereign immunity for some tort claims arising out of the conduct of government employees acting within the scope of their employment. The FTCA also provides that the United States shall, under certain limited circumstances, defend suits brought against its employees. More specifically, § 2679 of the FTCA provides that "[t]he Attorney General shall defend any civil action or proceeding brought in any court against any employee of the Government or his estate" for damage or injury resulting from the negligence of a government employee acting within the scope of his office or employment. 28 U.S.C. § 2679(c).

A party named as a defendant in a lawsuit may petition the Attorney General for certification that he was an employee "acting within the scope of his office or employment at the time of the incident out of which the claim arose[.]" 28 U.S.C. § 2679(d)(1). If the Attorney General denies the petition, the party defendant may petition the court to "find and certify that the employee was acting within the scope of his office or employment." 28 U.S.C. § 2679(d)(3). Upon certification by the court, the United States is substituted as the party defendant. *Id.*

"Employee of the government" is defined as "officers or employees of any federal agency . . . and persons acting on behalf of a federal agency in an official capacity, temporarily or permanently in the service of the United States[.]" 28 U.S.C. § 2671. " 'Federal agency' includes . . . military departments . . . and corporations primarily acting as instrumentalities or agencies of the United States, but does not include any contractor with the United States." *Id.*

■ Caltech, having been denied certification as a government employee by the Attorney General,[7] has petitioned this Court for certification. The Army, a military department of the United States government, is a federal agency pursuant to § 2671. If Caltech acted as an agency of the Army, or if Caltech employees acted "on behalf of" the Army, then Caltech fits within § 2671's definition of an employee. If Caltech also satisfies the "scope of employment" element, it may be certified under § 2679. Caltech bears the burden of proving by a preponderance of the evidence that it is entitled to certification pursuant to § 2679(d)(3). *See Green v. Hall,* 8 F.3d 695, 698 (9th Cir.1993).

## B. Certification of Entities

The government argues that certification is only appropriate for natural persons and that entities may not be certified as government employees. The government bases its argument on the language of § 2679, which uses the pronouns "him" and "his" in reference to an employee of the government, but does not include any reference to "it." *See, e.g.,* 28 U.S.C. § 2679(b)(1) ("any employee of the Government . . . acting within the scope of *his* office or employment") (emphasis added); 28 U.S.C. § 2679(c) ("[t]he Attorney General shall defend any civil action or proceeding brought in any court against any employee of the Government or *his* estate," "[t]he employee . . . shall deliver . . . all process served upon *him* . . . to *his* immediate superior . . . .") (emphasis added). Additionally, the government contends that certifying corporate entities would be contrary to the purpose of § 2679, which was passed to immunize federal employees from *"personal"* liability

---

**7.** Caltech presented a claim for certification to the Attorney General in a letter dated July 23, 1998. This claim was denied in a letter dated October 28, 1998, signed by the Director of the Torts Branch, Civil Division, of the United States Department of Justice, acting pursuant to authority delegated by the Attorney General. *See* 28 C.F.R. Part 15.

for acts committed within the scope of their employment. 134 Congr. Rec. S15596–06, § 2(b) (1988) (emphasis supplied).

While such references to "him" "his" or "personal" liability exhibit Congress' intention to indemnify natural persons who are governmental employees, nothing in the text of § 2679 expressly confines certification to natural persons. The definitional section of the FTCA, 28 U.S.C. § 2671, does not use the pronouns "him" or "his" in the definition of "employee of the government." Rather, that section includes within the scope of the definition of an employee "*persons* acting on behalf of a federal agency in an official capacity, temporarily or permanently in the service of the United States, whether with or without compensation." (emphasis supplied.) Moreover, the word "person," when used in the United States Code, is expressly defined to include corporate entities. 1 U.S.C. § 1.

Furthermore, entities have been certified as employees of the government, both by the courts and by the Attorney General. In *B & A Marine Co. v. American Foreign Shipping Co.*, 23 F.3d 709 (2d Cir.1994), the court certified an entity as an employee of the government under 28 U.S.C. § 2679. Similarly, in *Pervez v. United States*, 1991 WL 53852 (E.D.Pa. April 9, 1991), the United States was substituted as sole defendant after the Attorney General certified named defendant Carpenter Technology as an employee of the government.[8] In addition, in both *Ferguson v. United States*, 712 F.Supp. 775 (N.D.Cal. 1989), and *Scallorn v. United States*, 1996 WL 478973 (N.D.Cal. August 13, 1996), the courts found that defendant Sandia National Laboratories was an employee of the government and an agent of the government, respectively, pursuant to § 2671.

■ The government has failed to cite any authority to support its position that an entity may not be certified. Moreover, its attempts to distinguish the above-mentioned cases are unavailing. The government argues, for example, that *Ferguson* and *Scallorn* are distinguishable, in that the courts there addressed the status of individual employees working for the government rather than the contractors' relationship with the government agency. However, the court in *Ferguson* explicitly held that "Sandia acts on behalf of the DOE[,]" 712 F.Supp. at 782, while the court in *Scallorn* found that "Sandia functioned as an agent of the DOE[.]" 1996 WL 478973, *6. Furthermore, the court in *B & A Marine* held that the defendant's relationship with the government was the critical issue. 23 F.3d at 713. Thus, because it appears that entities may be certified pursuant to § 2679, the Court will address the merits of Caltech's petition for certification.

## C. Employee or Independent Contractor

The parties disagree regarding the standard applicable to the determination of whether Caltech was as an "employee of the government" during the relevant time period. The Supreme Court in *Logue v. United States* set forth the required analysis:

> [T]he 'contractor with the United States' language of § 2671 adopts the traditional distinction between employees of the principal and employees of an independent contractor with the principal, and . . . the critical factor in making this determination is the authority of the principal to control the detailed physical performance of the contractor.

412 U.S. 521, 527–28, 93 S.Ct. 2215, 37 L.Ed.2d 121 (1973). Three years later, in *United States v. Orleans*, the Supreme

---

**8.** *Pervez* appears to be the only case in which the government itself sought certification of a corporate defendant pursuant to § 2679. The government, however, asserts that it erroneously certified the corporate defendant in *Pervez*. *See* Transcript of August 13, 1999 Hearing, pp. 46, 49.

Court reiterated this standard: "[a] critical element in distinguishing an agency from a contractor is the power of the Federal Government 'to control the detailed physical performance of the contractor.'" 425 U.S. 807, 814, 96 S.Ct. 1971, 48 L.Ed.2d 390 (1976) *quoting Logue,* 412 U.S. at 528, 93 S.Ct. 2215. The court added that "the question here is ... whether [the contractor's] day-to-day operations are supervised by the federal government." *Id.* at 815, 96 S.Ct. 1971. The government and plaintiffs assert that the precise question to be answered is whether the government actually exercised control over the detailed physical performance of Caltech's services. Caltech, however, contends that it need not show actual supervision and control and that the correct standard is whether the government had the right to supervise and control Caltech, even if the government did not exercise that right.[9]

A review of the Ninth Circuit case law interpreting *Logue* and *Orleans* supports application of the "actual control" standard proffered by the government and plaintiffs. The Ninth Circuit has articulated this standard as requiring substantial supervision and control over the detailed physical performance and day-to-day operations of the contractor. *See Hines v. United States,* 60 F.3d 1442, 1446–47 (9th Cir.1995) ("critical question is whether the government supervises and controls the day-to-day operations"); *Laurence v. Department of the Navy,* 59 F.3d 112, 114 (9th Cir.1995) (finding independent contractor relationship based on government's failure to "exercise[ ] the requisite 'substantial supervision' by controlling the detailed physical performance and day-to-day work of [the contractor]"); *Letnes v. United States,* 820 F.2d 1517, 1519 (9th Cir. 1987) ("there must be substantial supervision over the day-to-day operations of the contractor in order to find that the individ-

ual was acting as a government employee").

Although the Ninth Circuit in *Ducey v. United States* expressed the standard in terms of the government's right to control, the court there found that the government did not possess the requisite authority to control the contractor's physical performance of its duties. 713 F.2d 504, 516–17 (9th Cir.1983). Accordingly, it was not necessary for the court to address whether the government's actual exercise of a right to control would be required to establish that the contractor was a governmental employee. *Ducey* therefore did not decide that the government's unexercised right to control would suffice. Caltech's citation to *Scallorn* and *Ferguson,* as well as *Bird v. United States,* 949 F.2d 1079 (10th Cir. 1991) and *Lewis v. Constitution Life Co.,* 96 Cal.App.2d 191, 215 P.2d 55 (1950) is also unavailing. None of these cases is controlling authority, and they are not persuasive here in light of recent Ninth Circuit law explicitly endorsing the actual control test.

■ Consequently, in order to determine whether Caltech was a government employee, rather than an independent contractor, the Court must inquire whether the United States possessed and exercised substantial day-to-day control over Caltech's waste disposal operations. *See Hines,* 60 F.3d at 1446–47; *Laurence,* 59 F.3d at 114.

### D. *Caltech's Contentions*

Caltech contends that the government operated JPL as a government employee for purposes of facilities and waste disposal during the Army years. An entity may be an employee or agent of the government for some purposes and an independent contractor for other purposes. *Ferguson v. United States,* 712 F.Supp. 775, 782 (N.D.Cal.1989). Therefore, Caltech claims, based on the evidence of what oc-

---

**9.** Caltech nonetheless contends that the government did, in fact, extensively supervise and control all aspects of waste disposal at JPL.

*See, e.g.,* Caltech's Reply Brief in Support of Petition for Certification, p. 26.

curred during the Army years, that the Court should grant Caltech's petition for certification with respect to facilities and waste disposal. Caltech suggests that the following facts demonstrate the government's actual day-to-day supervision and control over waste disposal operations at JPL.[10]

### 1. *Planning and Selection*

Caltech claims that the government planned and selected the waste disposal system at JPL through a Master Planning Board ("the Board"), appointed to oversee certain aspects of planning and management of JPL facilities.[11] Caltech App., Exh. 84, p. 2835. The original Board, appointed in 1949, was made up of three individuals: two military members—the chairman, Army Col. Broberg, and a representative from the Army Corps of Engineers, W.H. Spear; and the director of JPL, Dr. Louis H. Dunn. *Id.* By 1957, the Board was made up of eight military and six JPL personnel. Caltech App., Exh. 84, p. 2847.

Caltech contends that the government used the Board to control the development, funding, design and construction of facilities at JPL. For example, retired Col. Paul Scordas, Commanding Officer of the Army's Los Angeles Ordnance District ("LAOD") from 1957 to early 1961, was made the chairman of JPL's Board. Scordas Decl., ¶ 14. He explains that the Board directed and supervised the development of JPL property, including acquisition of land, siting of facilities, and the design and construction of these facilities, including buildings, test areas, and utilities. *Id.*

Caltech contends that the Board frequently held meetings to address facilities issues at JPL. The Board considered, among other things, land and building surveys, funding for proposed facilities, Army Corps data collection for use in designing and constructing the facilities, and compliance with Army safety regulations. As support Caltech has submitted the declaration of Robert J. Huguenard who worked for the LAOD Corps of Engineers from 1954 to 1959. Huguenard Decl., ¶ 1. Huguenard, however, states that he has no recollection of being a member of JPL Board, and although he remembers attending some Board meetings with JPL personnel, he does not remember the substance of those meetings. *Id.*, ¶ 18. Scordas specifically recalls JPL Board meetings, wherein the Board discussed the need to expand JPL property because new facilities and personnel raised concerns about safety. Scordas Decl., ¶ 15. Specifically, the Board was concerned with the quantity and placement of the storage of hazardous materials. *Id.*

In addition, Dalton Bergan, a JPL employee from 1946 to 1951, supervised design and construction of a wind tunnel and acted as a liaison between JPL and the Army Corps of Engineers. Bergan Decl., ¶¶ 1–2. Bergan returned to JPL from 1956 to 1973 as the Project Engineer for new construction in plant services, and acted as a liaison with the Army Corps of Engineers in constructing two JPL buildings. *Id.*, ¶¶ 2–3. Beginning in 1956, he was appointed to the Board. He also worked as Manager of JPL's Facilities and Plant Engineering Division. Bergan states that once the Board discussed a particular facilities issue, the Army would

---

10. Caltech also submits substantial evidence concerning the general operations at JPL which Caltech asserts demonstrates the government's day-to-day supervision and control of JPL. However, because the present discussion is directed to the question of whether the government exercised day-to-day supervision and control over JPL's waste disposal operations, the Court considers this more general evidence only to the extent it is probative of

the more specific question, concerning waste disposal operations, presently before the Court.

11. The United States claims that government participation in the Master Planning Board cannot be equated to detailed control over the JPL workforce's daily activities.

decide how to resolve that issue. *Id.,* ¶¶ 12–13. Bergan states further that he recalls several occasions when the Army chose not to address waste disposal issues raised by JPL. *Id.,* ¶ 14. In particular, Caltech contends that its personnel requested that the Army expand a small sewer system at JPL in the 1950's, but that the Army elected not to do so. Bergan Decl., ¶ 14.

Caltech also relies on a transcript from the *County* case [12], wherein Col. Broberg testified that "[t]here wasn't one thing [Dr. Dunn] asked for that wasn't changed either to comply with [Army] regulations or comply with the funds that we thought might be made available for the purpose." Tr., 145. Col. Broberg also testified that changes required so far as construction of the buildings was concerned were "strictly in accordance with the Engineer Corps specifications." Tr., 152.[13]

In further support of its contention that the United States controlled JPL's waste disposal facilities through the Board, Caltech claims that the Board was responsible for the funding and management of utilities at JPL. For example, Scordas states in his declaration that the Board reviewed Land Use Plans for JPL which included utilities requirements. Scordas Decl., ¶ 14. Caltech also contends that the Army Corps of Engineers directly received construction bids, had the sole discretion as to whom they would select, and then entered into a contract directly with the selected contractor. Caltech App., Exh. 99, p. 3183. In addition, Bergan explains that "the Army controlled the management of utilities on JPL site, including the waste disposal system. If changes to the utilities were needed, it was the Army Corps that would decide whether to make the change." Bergan Decl., ¶ 14.

Caltech further argues that the government controlled all phases of construction at JPL, including waste disposal facilities. Bergan explained that the Army followed established procedures for developing construction projects and that JPL's participation was limited to providing general and technical information. Bergan Decl., ¶¶ 8–11. Furthermore, Huguenard outlined the normal process for the construction of an approved project: the military would prepare the draft plans and specifications for the facility, then an outside architect hired by the Army would prepare the final plans and specifications. The LAOD would closely supervise the outside architect's work. The Army's construction division would then accept bids from private contractors for construction of the facility, and construction division inspectors would supervise the work. Huguenard Decl., ¶¶ 7–10. Caltech asserts that the Army required its contractors to follow detailed specifications and drawings with regard to materials, plumbing and hardware, and also furnished materials for construction by contractors. Huguenard Decl., ¶ 10; Exh. 100, pp. 3233–3180. In addition, Caltech contends that upon transfer of ownership of JPL from the Army to NASA in 1959, NASA followed a similar procedure for designing and constructing JPL facilities. Bergan Decl., ¶¶ 17–21.

### 2. *Design and Construction*

Caltech claims that the United States' alleged design and construction of the

---

**12.** *California Institute of Technology v. County of Los Angeles,* No. 614847, filed in the Los Angeles County Superior Court in June 1953, by Caltech against the County of Los Angeles seeking to recover property tax payments. The United States intervened as a plaintiff in the suit, asserting that it had an interest in the outcome of the case, based on its relationship with Caltech. The Court has previously held that the government is not judicially estopped from denying that Caltech is an employee because the issues litigated in that case differ significantly from those presented by the instant case.

**13.** The United States claims that, contrary to Caltech's assertions, a review of the transcript in the County case reveals that the government maintained the right to direct and inspect work at JPL in a general sense and that Caltech was an independent contractor for purposes of waste disposal.

898

waste disposal system at JPL is "the most critical fact demonstrating the government's control of waste disposal at JPL." Caltech Reply, p. 13.

### a. *Cesspool System*

Caltech contends that, in the 1940's and 1950's, the government decided to dispose of waste at JPL through a cesspool system, which included the use of cesspools, acid drain pits, and dry wells. According to Caltech, this system was designed and built pursuant to detailed government regulations and specifications, under the direction of government personnel, and was used with the government's full knowledge, participation, and approval.[14]

Caltech sets forth Army regulations which, Caltech contends, governed all aspects of the design and construction of JPL facilities, including its waste disposal facilities. Section Five of the Safety Manual, entitled "Construction and Utilities" provides: "Each new operating and auxiliary building, and each new utility pertaining thereto, at any Ordnance establishment, *shall* comply with the mandatory provisions of this Section and other Department of the Army regulations concerning safety." Caltech App., Exh. 38, p. 1360 (emphasis in original). Furthermore, Robert Bailey and Norris Bachtell, Ordnance inspectors in Indiana during the 1950's, stated in their declarations that all Ordnance installations were governed by the rules contained in the Safety Manual. Bailey Decl., ¶ 4; Bachtell Decl., ¶ 4.

One provision within Section Five on "Drains and Sumps" explains that sumps are required for drains handling explosive waste and provides details as to the design and placement of drains and sumps. *Id.,* p. 1366. In addition, the Safety Manual contains a Section on the Collection and Destruction of Explosives and Ammunition. This Section provides specific means

for disposing of industrial waste, such as sump pumps, settling beds, leaching pits, and closed containers. Caltech App., Exh. 38, pp. 1633–34.

Caltech next sets forth various Army Corps of Engineers specifications which allegedly demonstrate that the government controlled construction of the cesspool system at JPL. The Army Corps of Engineers solicited bids for various construction projects at JPL in 1947, 1951, 1952, and 1956. The Corps provided specifications for these projects which include detailed requirements for the materials and design of cesspools, acid drain pits, dry wells, and floor drains. Caltech App., Exh. 108, pp. 3773, 3783–84, Exh. 110, pp. 3791, 3809–10, 3813, Exh. 112, pp. 3862, 3871, Exh. 113, pp. 3876, 3879, Exh. 115, pp. 3911, 3921, Exh. 116, pp. 3938, 4006.

In addition, Caltech contends that Army inspections at JPL demonstrate the government's control over the design and construction of the cesspool system. Caltech asserts that during routine inspections, government inspectors focused on—and issued specific orders about—waste disposal. Bachtell, in his declaration, explains that he conducted an inspection of JPL in 1955. He inspected the acid storage dock and fuel storage dock and noted that neither was equipped with drains connected to sumps or with dykes, and he directed that these systems be installed in compliance with the Ordnance Safety Manual. Bachtell Decl., ¶ 7, Exh. A.

### b. *Delaying Construction of Sewer System*

Caltech next argues that the government failed to install a sewer system at JPL for seven years after Caltech requested one, thus underscoring the government's control over JPL. The City of Pasadena expressed concerns to JPL regarding groundwater contamination to JPL in

14. The United States disputes Caltech's assertion that the government designed and constructed all the waste disposal facilities at JPL. Rather, the government contends that Caltech was deeply involved with the design and construction of the facilities at JPL prior to 1946.

1948, and explained that the only solution to prevent contamination was to connect JPL to the City of Pasadena's sewer system. Caltech App., Exh. 121, p. 4117. Caltech asserts that it advised the Army of the City's concerns in early 1949, and requested funding for the installation of a sewer system. Caltech App., Exh. 126, p. 4157. The Army did not receive final. approval to build a sewer system at JPL until 1955. After receiving final approval, Caltech argues, the Army designed the sewer system, entered into a construction contract with its contractors, and monitored and supervised the construction of the sewer system. Caltech App., Exh. 139, pp. 4364–66, 4400. Caltech further notes that the Army, and later NASA rather than Caltech, negotiated sewage service contracts with the City of Pasadena. Exh. 140, pp. 4470–74, Exh. 146, pp. 4502–02, Exh. 147, pp. 4550–4565.

### 3. Supervision and Direction of Waste Disposal

Caltech further argues that the government supervised and directed waste disposal at JPL through stringent regulations, by constant monitoring and inspection of the facilities, and by direct participation in on-site and off-site waste disposal.

### a. Regulations

Caltech contends that portions of the Army Ordnance Safety Manual demonstrate governmental control over waste disposal at JPL. In support of this position, Caltech sets forth provisions of the Safety Manual pertaining to the disposal of hazardous waste.[15] Caltech App., Exh. 38. As explained above, Bailey and Bachtell state in their declarations that facilities at

Ordnance installations were governed by the Ordnance Safety Manual. Bailey Decl., ¶ 5; Bachtell Decl., ¶ 5. Further, Section 27 of the Safety Manual is devoted to the "Collection and Destruction of Explosives and Ammunition." It contains provisions regulating, for example, the "Collection of Contaminated Industrial Wastes," the Destruction of Collected Solid Waste, "Containers for Waste Explosives," and "Dumping at Sea." Caltech App., Exh. 38, pp. 1633–46.

Caltech claims that, by means of government regulations, the government controlled waste disposal at the most minute level of detail. For instance, the Safety Manual contains a provision relating to "Housekeeping" which directs that:

> In explosives areas waste materials such as oily rags, combustible and explosive scrap and paper shall be kept separate from each other. Such waste should be placed in approved marked containers for each, preferably located outside the buildings. Scrap explosives shall be removed from operating buildings at least once every shift. . . . Spillage of explosives and other hazardous materials shall be prevented so far as practicable[.]

Caltech App., Exh. 38, pp. 1529–30.

### b. Supervision

Caltech further argues that close government supervision of waste handling and disposal at JPL demonstrates that the government controlled waste disposal there. During regular inspections, Caltech argues, the government examined the storage, handling and disposal of chemicals, solvents, and hazardous materials at JPL to determine compliance with Army regulations. Caltech relies on the testimo-

---

**15.** Caltech also relies on other provisions of the Army Ordnance Safety Manual pertaining to the handling, storage and processing of hazardous waste. Caltech App., Exh. 38. For example, Section 13 covering "Specific Chemicals" contains sections on "Building Construction for Acids," "Acid Storage," and "Handling Acids and Shipment of Dangerous Chemicals." *Id.*, pp. 1479–80. Section 15 on "Long Range Rockets and Guided Missiles" similarly contains sections pertaining to the "Unloading and Handling" of chemical products used for propelling rockets and guided missiles, and requiring the "Main Storage Areas" and "Test Areas" to conform with location requirements. *Id.*, pp. 1507–09.

ny of Col. Scordas who, at his deposition, was asked, "[w]hat did you do, if anything, to prevent pollution of the underground water supply with hazardous chemicals?" Scordas Depo., p. 35. Scordas responded that "[t]here are written procedures for the disposal of chemicals, and the District insisted that they comply with those procedures." *Id.*

As further support, Caltech relies on the declarations of Bachtell and Bailey. Bachtell refers to a letter describing an inspection he conducted at JPL. Bachtell Decl., ¶ 7, Exh. A. The letter explains, among other things, that Bachtell inspected acid and fuel storage docks, and concluded that they were not equipped with proper drains in compliance with the Safety Manual. *Id.* Caltech contends that only Army personnel were responsible for implementing Army recommendations about corrective or future actions. The Safety Manual requires that the commanding officer of an "Ordnance establishment" enforce the Manual's mandatory provisions and be guided by its advisory provisions.[16] Caltech App., Exh. 38, p. 1343.

Caltech also sets forth various government reports on inspections at JPL and related documents which, Caltech asserts, show the government's level of control over waste disposal at JPL. This evidence includes: (1) a 1949 safety inspection report noting a potential hazard created by the draining of liquid propellants into a common pump, Caltech App., Exh. 148, p. 4568; (2) a 1949 inspection report noting that certain storage containers were equipped with a common drain which might allow propellants to mix and cause a fire of explosion, *Id.*, Exh. 44, p.2094; (3) a letter from JPL to the Army Ordnance District, concerning a 1953 safety inspection report addressing JPL's burning of scrap propellant, *Id.*, Exh. 149, p. 4572–73; (4) a letter from JPL to the Army Ord-

nance District concerning a 1954 safety inspection report requesting that three "carboys of Ska–Sol" be moved from the fuel dock, *Id.*, Exh. 150, p. 4575; (5) a letter from JPL to the Army Ordnance District explaining that weep holes had been installed in the mixing kettles in accordance with a 1955 safety inspection report, and proposing use of a portable lamp in the paint shop, *Id.*, Exh. 152, p. 4579; (6) a 1955 safety inspection report noting that acid and fuel storage docks were not equipped with proper drains in compliance with the Safety Manual, *Id.*, Exh. 153, p. 454581–4584; Bachtell Decl., ¶ 7; (7) a 1956 safety inspection report recommending color-coding of government-owned compressed gas cylinders, Caltech App., Exh. 154, p. 4587; (8) a 1957 inspection report directing the installation of separate sumps for fuels and oxidizers as well as floor drains for the sumps, *Id.*, Exh. 155, pp. 4588–89; (9) a 1958 inspection report indicating that a regular program of cleaning and disposal should be conducted daily at the waste propellant collection station, *Id.*, Exh. 156, p. 4595; (10) a 1959 safety inspection report recommending that certain hazardous materials be stored separately in accordance with the Safety Manual, *Id.*, Exh. 157, p. 4598–99.

c. *Participation and Direction*

Caltech also contends that the government controlled waste disposal at JPL by participating in day-to-day waste disposal practices and decisions. Caltech claims that government employees worked alongside JPL employees and directly participated in the handling and use of chemicals, the construction of test motors, and the firing of propellant into water channels for torpedo research. Russell Byers, a JPL employee, testified at his deposition that he worked alongside approximately ten military personnel who participated in the grinding mixing, casting and curing of pro-

---

**16.** Nothing in the manual prevents the Army from delegating responsibility for compliance with the Safety Manual or other regulations. The United States contends that Caltech, rath- er than the Chief of Ordnance, was responsible for complying with applicable safety regulations, including those set forth in the Safety Manual.

pellant. Caltech. App., Exh. 220, pp. 5455–57. In addition, Caltech sets forth various photographs depicting individuals in military and civilian dress working together on missiles and other projects. Caltech App., Exh. 4, pp. 212–264. All of these activities, Caltech argues, necessarily would have included waste disposal.

Furthermore, Caltech argues that government employees directed on-site and off-site waste disposal activities at JPL. A 1945 map of JPL entitled "Military Construction, Roads, Plot Plan, R1" depicts two "waste areas" and states that "wasting of material in waste areas is to be done under direction of contracting officer." Caltech App., Exh. 234.[17]

Caltech also asserts that the government directed day-to-day waste disposal at JPL by requiring Caltech to comply with detailed procedures governing the disposal of government property.[18] Supplement No. 9 of the initial Letter Order Contract between the government and Caltech contains a provision governing "Disposition of Government-owned Property." *Id.*, Exh. 11, p. 568. This provision describes government-owned property as including "scrap and waste materials" and indicates that "[w]ith the approval in writing of the Contracting Officer ... the Contractor may transfer or otherwise dispose of such Government-owned property to such parties and upon such terms and conditions as the Contracting Officer may approve or ratify[.]" *Id.* Furthermore, a 1951 supplement to a subsequent Letter Order between the government and Caltech contains an identical provision entitled "Sale

of Government-owned Property." *Id.*, Exh. 14, p. 814.[19]

In addition, Caltech submits several documents attached to the declaration of Paul DiPong, an Assistant Property Disposal Officer with the Los Angeles Ordnance District from 1953–1964,. These documents outline governmental procedures for the control of surplus government property. Section VII of Armed Services Procurement Regulations ("ASPR") establishes procedures for control of government property upon termination of a contract with a contractor. DiPong Decl., Exh. C. Appendix C to the ASPR is a Manual for Control of Government Property in Possession of Nonprofit Research and Development Contractors. This manual explains that "[p]rocedures for the control of scrap and salvage materials shall not be required unless the Property Administrator determines that the scrap or salvage is substantial in amount and that the Government is not receiving sufficient benefits from the use or disposal thereof[.]" DiPong Decl., Exh. D.

DiPong explains in his declaration that Section VIII and Appendix C of the ASPR required JPL to follow specific procedures in the event that it was in possession of government property that exceeded what JPL needed under one of its contracts. DiPong Decl., ¶ 9. Under these circumstances, JPL was required to notify the Contracting Officer of the surplus material, request disposition instructions, and complete inventory sheets listing the surplus materials. *Id.* A specific form was also required for excess chemicals. *Id.*, ¶ 10. If the surplus materials could not be

---

**17.** The map appears to address the construction of roads at JPL and was prepared under the direction of Col. Rufus W. Putnam, a Los Angeles Ordnance District Engineer. However, nothing in the map indicates that its provision regarding waste disposal applies to waste disposal other than that associated with the road construction project. Caltech App., Exh. 234.

**18.** The United States argues that the evidence relied upon by Caltech to demonstrate the government's control over waste disposal pro-

cedures relates to government regulation of surplus property, including chemicals, and does not equate to involvement in the day-to-day use and disposal of chemicals.

**19.** These contractual provisions appear to address Caltech's sale or transfer of government-owned property rather than the disposal of waste and, in any event, do not expressly prohibit the disposal of waste absent government approval.

utilized by the government, JPL was required to attempt to sell the materials with the approval of the Contracting Officer. *Id.*, ¶ 12. If such a sale was not possible, Section VIII provided that the Contracting Officer could direct JPL to destroy or abandon the surplus materials. *Id.*, ¶ 13. The Contracting Officer would then direct JPL to dispose of surplus material by burning, dumping or burying it, or by some other method. *Id.*

Caltech sets forth three such requests from JPL, along with the Army responses thereto. A 1949 letter from JPL requests that the Army make arrangements for the disposal of chemical waste. Caltech App., Exh. 163, p. 4681. The Army agreed to do so. *Id.*, p. 4682. A 1950 letter from JPL seeks the Army's permission to sell perchlorate dust to a specified vendor at a specified price. *Id.*, Exh. 164, pp. 4683. The Army approved the sale. *Id.*, p. 4684. A 1952 letter from JPL requests that the Army grant JPL authority to sell surplus nitric acid. *Id.*, Exh. 165, p. 4685. The Army approved the sale. *Id.*, p. 4686. In addition, a 1954 letter from the Los Angeles Ordnance District authorized a request made by JPL to abandon or destroy surplus chemicals since efforts to sell the materials had been unavailing. Caltech App., Exh. 166, p. 4688. Caltech also contends that these practices continued in the years following the transfer of JPL to NASA. A 1960 letter from JPL to NASA seeks assistance in arranging the disposal of hazardous waste. *Id.*, Exh. 167, pp. 4689–90.

Caltech further contends that the government controlled off-site disposal of hazardous waste. The Army Ordnance Safety Manual provides that "[d]isposition instructions [for dumping at sea] are to be requested through the Chief of Ordnance from the Chief of Transportation, who has sole responsibility in the Department of the Army for selection of sites and methods of operation." Caltech App., Exh. 38, p. 1649. In addition, on three occasions in 1949, 1950 and 1955, JPL sought the Army's assistance in off-site disposal of hazardous waste. Caltech App., Exh. 168, pp. 4964–65, Exh. 169, pp. 4697–98, Exh. 170, pp. 4700–01; DiPong Decl., ¶¶ 21–22.

### 4. *FFRDC Status*

Caltech asserts that, unlike ordinary commercial contractors, JPL's status as a non-profit FFRDC supports a finding that the United States exercised day-to-day control over the waste disposal facilities at JPL.[20] FAR § 35.017(a)(2) provides that FFRDC's "accomplish tasks that are integral to the mission and operation of the sponsoring agency." Caltech notes that FAR § 35.017(a)(2) also establishes that an FFRDC must have a sponsoring agency that "manages, administers, monitors, funds and is responsible for the overall use of" the FFRDC. *Id.* However, Caltech fails to mention the remainder of FAR § 35.017(a)(2), which provides that an FFRDC is operated by a sponsoring agency "as an autonomous organization or as an identifiable separate operating unit of a parent organization." *Id.*

### 5. *Control Over Daily Administration*

Caltech argues that the United States exercised substantial control over the daily administration of JPL, including personnel decisions and technical issues. For example, Caltech asserts that, during the Army years, all prospective employees at JPL had to be approved by the government for security purposes. Caltech submits a series of correspondence between the Army and JPL discussing the Army's security clearance of particular JPL employees, as well as lists of JPL personnel indicating their level of security clearance. Caltech App., Exh. 221, pp. 5460–5484. Col. Scor-

---

**20.** The United States agrees that JPL became an FFRDC, but notes that JPL was not designated as an FFRDC until after the Army contracts had ended. Furthermore, the government contends that Caltech actually benefitted greatly from its long-term contractual relationship with the government.

das also states in his declaration that "JPL was treated like any Army installation when it came to security." Scordas Decl., ¶ 17.

In addition, Caltech contends that the government paid the salaries of JPL personnel and distributed payment for vacation, sick leave, and non-salary employee benefits. Supplement No. 9 provides that "the Contractor shall be reimbursed" for a variety of costs, including "the cost to the Contractor of all direct labor and services required in the performance of this contract." Caltech App., Exh. 11, p. 549. That provision further describes "direct labor and services" as including "salaries and wages" and "Federal and State Social Security taxes." *Id.* Other contracts in effect between the Army and Caltech contained similar provisions. *See* Caltech App., Exh. 14, p. 777; Exh. 179, p. 4797. Furthermore, Caltech asserts that the Army—Caltech contracts permitted the government to make unilateral personnel decisions. For example, Article 35 of Supplement No. 9 permitted the Army to dismiss any JPL employees who were incompetent or "whose retention [was] deemed to be not in the public interest." Caltech App., Exh. 180, p. 4844. Article 15(j) of Supplement No. 9 also permitted the Army to "suspend from access to work under [the] contract any officer or employee whose continued employment [was] deemed ... to endanger the security of the war effort." *Id.*, p. 4825.

### 6. *Restatement of Agency Factors*

Courts also consider other factors, such as those listed in Section 220 of the Restatement (Second) of Agency, in determining whether one is an employee as defined by §. 2671. *See Logue*, 412 U.S. 521, 527, 93 S.Ct. 2215, 37 L.Ed.2d 121 (1973); *Slagle v. United States*, 612 F.2d 1157, 1160 (9th Cir.1980). Caltech claims that the following Restatement factors support a finding that it operated as an employee, rather than an independent contractor, with respect to waste disposal at

JPL: (1) Instrumentalities, Tools and Place of Work: Caltech contends that the government provided it with the land, facilities and equipment necessary for carrying out its research and testing activities. Furthermore, Caltech claims that the government provided the waste disposal system. (2) Method of Payment: Caltech claims that it received no profit during the Army years. (3) Length of Employment: Caltech maintains that the government supervised and controlled JPL for decades. (4) Specialized Skills: According to Caltech, it possessed highly specialized skills necessary to perform its scientific work, but *no* such specialized skills were required to operate the waste disposal facilities at JPL. Moreover, Caltech contends, the Army Corps of Engineers specializes in facility design, construction and management. (5) Extent of Control under Contracts: Caltech contends that, pursuant to its contracts with the government as well as governmental regulations, the government exercised supervision and control over JPL. (6) Parties' Beliefs: Caltech submits the government's position in the *County* case as evidence that the parties believed Caltech to be an employee rather than an independent contractor.

### E. *The United States' Contentions*

The United States asserts that Caltech operated as an independent contractor, not as an employee of the government as defined by § 2671, because the government did not control or supervise the detailed day-to-day waste disposal practices at JPL. Rather, the government argues, Caltech's "massive" JPL workforce was responsible for waste disposal.

### 1. *Insistence on Treatment as an Independent Contractor*

In opposing certification, the United States contends that the evidence assembled by the parties during discovery demonstrates that Caltech was an independent contractor, in that throughout the history of JPL, Caltech insisted on being treated

as such. For example, the government submits a letter dated December 18, 1953, to the Army's Chief of Ordnance, wherein Caltech's president, Dr. Lee DuBridge, opposed the Army's appointment of a commanding officer for JPL. U.S.App., pp. 771–74. In the letter, Dr. DuBridge characterized the nature of the relationship between the Army and JPL:

Though the nature of the projects is subject to joint agreement between [Caltech] and the government agency concerned, the performance under the contract is the responsibility of [Caltech]. Subsequent to such joint agreements the government does not attempt to instruct [Caltech] as to its utilization of personnel and equipment in carrying out its work. . . .

It is true that all lands, buildings and equipment comprising [JPL] are owned by the government, as is certain equipment located on the [Caltech] campus which was purchased with government funds. The land and buildings of [JPL] are made available to [Caltech] under a lease dated December 5, 1950 between [Caltech] and [the Army]. . . . [Caltech] is bound, under this lease and the contract, to take reasonable care of government-owned property but it is felt that [Caltech's] judgment must be final in determining how such property shall best be used to forward the research activities for which [Caltech] is responsible.

*Id.*, p. 771.

General E.L. Cummings of the Army Ordnance Department responded by letter dated December 25, 1953, wherein he attempted to ease Dr. DuBridge's "undue apprehension." U.S.App. pp. 779–80. He explained:

It has never been the wish or intent of Ordnance to exercise control of how the contractor goes about fulfilling his contract; i.e., to place Ordnance military or civilian personnel in supervision of JPL's work.

. . . . .

Your letter indicates undue apprehension with regard to Ordnance policies (which have been long established and which I do not intend to change), and as to their consequences. Ordnance believes in contracting for as large a single responsibility as practicable, and in holding the contractor responsible for results, with a minimum of direction on how he achieves those results.

*Id.*, p. 779.

The government also relies on comments made by Dr. DuBridge during a February 11, 1974 interview for a JPL–Caltech oral history program. U.S.App., pp. 753–766. When asked about a provision of the contract between JPL and NASA, Dr. DuBridge responded:

It was clear that in our discussions with NASA we emphasized that we were still a private institution, that we were not a government agency nor a civil service laboratory, that it was of value for us and them to maintain independence[.]

. . . . .

The NASA administration had a little difficulty in reconciling the independent nature of JPL with the more restricted nature of the other NASA laboratories. Every now and then they would send out a directive to all NASA laboratories. JPL would get one and we would write back and say we assume that this doesn't apply to JPL since this involves a variation of our agreement about JPL's independence to pursue its own administrative and other policies. Usually that worked out, but it did involve some discomfort and difficulty in the NASA administration, to have one lab standing out as an independent contract operated lab while the others were more specifically under detailed NASA control.

*Id.*, pp. 758–59.

2. *Regulations and Inspections*

In addition, the United States contends that its imposition of governmental regula-

tions and periodic inspections does not amount to the detailed day-to-day governmental supervision of the waste disposal operations. To the contrary, it argues, Caltech contractually obligated itself to comply with applicable safety and security regulations. For example, Supplement No. 9 to the initial Letter Order contract between the United States and Caltech, No. W–04–200–Ord–455, includes Article 15 governing Plant Protection. Article 15 explains: "The Contractor shall at all times comply with all applicable local, State and Federal laws[.]" U.S.App., p. 251. In addition, under Article 35, which outlines "General Requirements," Caltech agreed to:

> Procure all necessary permits and licenses; obey and abide by all applicable laws, regulations, and ordinances, and other rules of the United States of America, of the State, territory or subdivision thereof wherein the work is done, or of any other duly constituted authority.

U.S.App., 252. Therefore, the United States' contends, its imposition of regulations and conducting of inspections merely constituted monitoring of Caltech's contractual compliance and reflected the government's control over its real property. The United States also argues that its ability to compel compliance with governmental regulations does not, as a matter of law, constitute detailed control over JPL's waste disposal operations.

### 3. *Testimony Indicating that the United States Did Not Control Waste Disposal at JPL*

As further evidence that it did not control JPL's day-to-day waste disposal operations, the United States relies on statements made by Army Ordnance inspector Norris Bachtell during his deposition. When asked whether he ever directed anyone at JPL in the disposal of hazardous waste, Bachtell responded "[n]o." U.S.App. p. 988. In addition, Bachtell was asked: "[i]s it a fair statement that when your office inspected a government-owned contractor-operated facility, that if you saw something that you thought needed correction or change, you would make a recommendation to the contractor, but you would not issue instructions to the contractor?" He answered: "[t]hat's correct, we didn't." *Id.*, p. 989. Bachtell was also questioned about the Ordnance Safety Manual. He was asked: "[i]f you found that a government-owned contractor-operated facility had not complied with the rules in the Ordnance Safety Manual, what was your procedure and policy?" Bachtell responded:

> Our policy was to discuss the violation with the people at the facility that were responsible for operating the facility, get back to the office that I worked for and write a written report stating the condition and that action should be taken to correct it. We did not tell them how to correct it.

*Id.*, p. 991.

The United States also relies on the deposition of retired Col. Paul Scordas, Commanding Officer of the Army's Los Angeles Ordnance District. During his deposition, Scordas addressed the government's monitoring of JPL. When asked whether he agreed with the statement of Dr. William Pickering, JPL's former director, that the Army never directed Caltech's day-to-day operations of JPL, Scordas testified:

> The directions that we gave to JPL were only what was outlined in the contract, and we wanted to be sure as to safety, operational. And ... as long as they complied with the contract, we had no problems.

U.S.App., p. 1060.

Furthermore, the government submits the deposition of Paul DiPong, an Assistant Property Disposal Officer with the Los Angeles Ordnance District from 1953–1964. DiPong testified at his deposition that neither he, nor anyone at the Los Angeles Ordnance District supervised the activities of any JPL employees, and that

he was not authorized to give orders or instructions to any JPL employees. U.S.App., 951–52. In addition, DiPong testified that his job responsibilities did not include the handling or disposal of chemical waste. *Id.*, p. 952.

The United states also relies on the deposition testimony of Dalton Bergan, who worked as Manager of JPL's Facilities and Plant Engineering Division. Bergan testified that no member of the Army ever supervised his day-to-day activities or those of anyone he worked with. U.S.App., pp. 884–84. He also explained that, when hiring employees, he did not need government approval. *Id.*, p. 885.

### 4. *Evidence of Caltech's Control of Waste Disposal Facilities*

The United States contends that Caltech, rather than the government, actually controlled waste disposal operations at JPL. As support, the government submits certain letters to and from JPL, as well as internal JPL memoranda, which allegedly demonstrate that JPL employees routinely responded to inquiries from local and state agencies concerning waste use and disposal. For example, a letter dated May 27, 1946, from L.G. Fenner of Caltech to a plumbing inspector for the City of Pasadena provided a report on the nature and amount of chemicals present in waste water at JPL. U.S.App., p. 417. The letter further explained that:

> [I]n practice [the chemicals] are rejected to the stream bed and diluted with large quantities of wash-down water. It is the opinion of all concerned, for what it is worth, that in no case could the waste serve as a means of contamination of the water supply.

U.S.App., 417. In addition, V.C. Larsen, JPL Administrator, sent a letter dated May 24, 1951, to the County Engineer's Industrial Waste Division. *Id.*, pp. 259–61. The letter, in response to a request for a report on "waste disposal methods employed at [JPL]," provided details about existing and proposed waste disposal facilities, chemical waste disposal, and solid propellant waste disposal. *Id.* Larsen sent another letter dated October 4, 1951, to the City of Pasadena Water Department, requesting permission to dispose of certain chemical waste in the Arroyo Seco. *Id.*, p. 429. Furthermore, a letter dated March 16, 1961, from the Pasadena Water Department's Chief Engineer to JPL, expressed appreciation for JPL's "willingness to cooperate in the elimination of waste products considered to be harmful to the quality of the ground waters" and offered several "suggestions" to serve "as a guide in establishing future waste disposal policies as far as the elimination of potential contamination or pollution of the underground water[.]" *Id.*, pp. 446–47. An internal JPL Safety Office memorandum dated August 17, 1961, concerned storm drains and sewers. *Id.*, p. 451. Addressed to senior staff, section chiefs and managers, group supervisors and safety coordinators, the memorandum directed that storm drains should receive only water free from pollutants and contaminants. It further explained that certain materials, such as oil, grease and unneutralized acids were not to be discharged into the sewer system. *Id.*

The government also relies on statements made by Dr. William H. Pickering in a declaration filed with this Court in *Suzanne Savary, et al. v. United States of America*, No. CV 95–7752–E (C.D.Cal. Feb. 14, 1998). In that declaration, Dr. Pickering stated that Caltech employees were responsible for day-to-day waste disposal at JPL, and that the Army did not supervise or control the Caltech workers who were responsible for waste disposal. Dr. Pickering declared:

> The Army never directed Caltech's day-to-day operations at JPL. Caltech was responsible for directing the day-to-day operations at the JPL, and managing the scientific and engineering projects carried out at the JPL.
>
> Although the physical plant was owned by the Army at the time, Caltech

was responsible under the contract for maintenance and repair of the facilities so as to perform the work described in the contract.

Caltech supplied the managerial and supervisory personnel necessary to control the day-to-day operations of the facility. Army employees did not conduct or supervise any of the day-to-day work under the contract. . . .

To the best of my knowledge, during the period of 1941 to 1958, Caltech employees were responsible for day-to-day waste disposal at the JPL. To my knowledge, the Army did not have any employees at JPL who were responsible for waste disposal and did not supervise or control the Caltech workers who were responsible for waste disposal.

U.S.App., pp. 4–5.[21]

### F. *Plaintiffs' Contentions*

In opposing Caltech's petition for certification, plaintiffs essentially join the United States' position, as plaintiffs' contentions mirror those of the government. In addition, plaintiffs contest Caltech's argument that the Restatement factors support a finding that Caltech operated as a government employee.

### G. *Analysis*

■ As outlined above, Caltech bears the burden of proving, by a preponderance of the evidence, that it is entitled to certification under § 2679. In an effort to fulfill that burden, Caltech has submitted voluminous evidence to support its argument that it functioned as an employee of the United States with respect to waste disposal at JPL. The Court finds, however, that Caltech has not met its burden of demonstrating by a preponderance of the evidence that the United States exercised substantial supervision and control over JPL's day-to-day waste disposal operations. Rather, the evidence leads the Court to find that Caltech operated JPL's

---

21. In this case, however, Dr. Pickering has submitted a supplemental declaration in which he claims that statements made in his prior declaration regarding control over JPL's waste disposal operations were not based on his personal knowledge but, rather, were his assumptions. He now states as follows:

Throughout my tenure at JPL, I primarily was involved with the technical and scientific aspects of JPL's operations. . . , I was not directly involved with the design, construction, or management of JPL's facilities or waste disposal system or practices.

Therefore, I do not know the government's role in the design, construction, or management of JPL's facilities or its waste disposal system. Nor do I have specific knowledge about JPL's waste disposal practices or the extent to which the government participated in JPL's waste disposal activities. Issues concerning facilities and waste disposal were delegated to and handled by others[.]

In or around March 1996, I reviewed and signed a declaration in the lawsuit of *Savary v. United States*. In that declaration, I provided a general description of the relationship between JPL and the government during my tenure at JPL. . . . I also described my general understanding of the working relationship between JPL and the government (first the Army and later NASA)

throughout that period. I did not, however, provide specific information about JPL's facilities or its waste disposal practices because I do not have personal knowledge about those areas.

In paragraph 13, I stated that, "[t]he Army never directed Caltech's day-to-day operations at the JPL," but crossed out the words "including waste disposal operations" because I do not have knowledge about this subject. In paragraph 19 I stated that *"[t]o the best of my knowledge,* Caltech employees were responsible for day-to-day waste disposal at the JPL" and that *"to my knowledge,* the Army did not have any employees who were responsible for waste disposal and did not supervise or control the Caltech workers who were responsible for waste disposal." Those statements accurately reflected my assumptions about JPL's waste disposal activities; they are not, however, based upon any personal knowledge or specific information in my possession.

Caltech App., Exh. 301, pp. 6573–76 (emphasis in original). The Court notes that Dr. Pickering was the Director of JPL from 1954 to 1976, and was affiliated with JPL for many years prior thereto. Nonetheless, in light of his new declaration, the Court has determined not to consider his prior declaration in reaching its decision on the present motions.

waste disposal facilities as an independent contractor.

Initially, it must be noted that Caltech's substantial reliance on governmental regulations and inspections is misplaced. The Ninth Circuit has explained that "detailed regulations and inspections are no longer evidence of an employee relationship.... [T]he ability to compel compliance with federal regulations does not change a contractor's personnel into federal employees." *Letnes*, 820 F.2d at 1519 (citations omitted). In *Letnes*, for example, the court found that "restrictive" governmental regulations and inspection procedures, which were designed to secure the safety of Forest Service airplanes, rather than control their detailed physical operation, did not convert pilots under contract with the Forest Service into government employees. *Id.* Similarly, the court in *Ducey* held that contractual provisions requiring a National Park Service concessioner to comply with detailed rules and regulations designed to secure federal objectives, despite their restrictive effect on the contracting party, did not convert an independent entrepreneur into an agent of the federal government. 713 F.2d at 516. These contractual provisions, moreover, left the concessioner free, in large part, to select the day-to-day means of implementing the contractual requirements. *Id.*

As in *Letnes* and *Ducey*, the governmental regulations and inspections relied upon by Caltech do not convert Caltech into an employee of the government. The Army Ordnance Safety Manual is designed to secure the safety of those guided by its provisions. The regulations and inspections at issue here do not contain specific provisions controlling Caltech's day-to-day waste disposal activities. In addition, Army inspections of JPL, however frequent and detailed, ensured Caltech's compliance with its contractual obligations and safety procedures.

The Army's planning, selection, design and construction of JPL's waste disposal system also does not constitute day-to-day control over Caltech's waste disposal activities. Nothing in the relevant case authority suggests that the Army's design of JPL's waste disposal system equates to the detailed level of control over day-to-day waste disposal activities necessary for a finding that Caltech was a government employee for purposes of waste disposal. Although Caltech argues that those provisions of the Comprehensive Environmental Responses, Compensation Liability Act ("CERCLA"), 42 U.S.C. § 9607, establishing government liability for environmental contamination caused by contractors, provide an analogy for the present case, the Court does not find this argument persuasive. CERCLA imposes strict liability upon operators, as defined by the statute, for violations thereof, and involves environmental policy considerations entirely distinct from those presented by the present case. 42 U.S.C. § 9607 (imposing strict liability for operators of facilities that dispose of hazardous waste); *In re Jensen*, 995 F.2d 925, 927 (9th Cir.1993) (CERCLA seeks to protect public health and the environment).

Furthermore, JPL's status as an FFRDC does not convert Caltech into a government employee. Caltech relies on two cases from the Northern District of California, *Ferguson v. United States*, 712 F.Supp. 775 (N.D.Cal.1989), and *Scallorn v. United States*, 1996 WL 478973 (N.D.Cal.1996), to support this argument. However, *Ferguson* and *Scallorn* are distinguishable.

Both *Ferguson* and *Scallorn* involved claims that Sandia National Laboratories ("Sandia"), an FFRDC, was acting as a government employee within the meaning of the FTCA in connection with Sandia's maintenance and security operations. *Ferguson*, 712 F.Supp. 775; *Scallorn*, 1996 WL 478973. The relevant contracts at issue in those cases specifically provided that Sandia would act as the Department of Energy's ("DOE") agent for certain purposes, including property maintenance and security, and that all work performed

by Sandia would be under the direct control of the DOE. *Ferguson*, 712 F.Supp. at 782; *Scallorn*, 1996 WL 478973 at *5–6. Both courts gave these contractual provisions great weight and, based on additional evidence concerning the actual relationships between the parties, found Sandia to be an employee of the government for purposes of conducting maintenance and security operations. *Id.*[22]

Unlike *Ferguson* and *Scallorn*, the contracts at issue in the present case consistently provide that Caltech is a contractor. Nowhere do the contracts provide that Caltech is a government agent. Moreover, as explained above, regardless of the language of the Caltech-government contracts, the evidence submitted by Caltech does not demonstrate that the government actually supervised and controlled the day-to-day waste disposal operations at JPL.

The *Restatement* factors argued by Caltech in support of certification similarly do not change this result. Caltech's argument merely recharacterizes its previous factual assertions under the framework of the *Restatement*. Without more, reliance on the Restatement factors is insufficient to show that Caltech was an employee of the government.

Accordingly, the Court determines that Caltech has failed to demonstrate by a preponderance of the evidence that the United States supervised and controlled the day-to-day waste disposal operations at JPL. The Court thus finds and concludes that Caltech is an independent contractor, rather than an employee of the government, and therefore Caltech's petition for certification must be denied.

## VI. MOTION FOR SUMMARY JUDGMENT

### A. *Standard for Summary Judgment*

Summary judgment is appropriate where "there is no genuine issue as to any material fact" and "the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party has the initial burden of identifying relevant portions of the record that demonstrate the absence of a fact or facts necessary for one or more essential elements of each cause of action upon which the moving party seeks judgment. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the moving party bears the burden of proof at trial, "the moving party must make a showing sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party." *Gipson v. Kajima Eng'g & Constr., Inc.*, 972 F.Supp. 537 (C.D.Cal.1997).

If the moving party has sustained its burden, the nonmoving party must then identify specific facts, drawn from materials on file, that demonstrate that there is a dispute as to material facts on the elements that the moving party has contested. *See* Fed.R.Civ.P. 56(c). The nonmoving party must not simply rely on the pleadings and must do more than make "conclusory allegations [in] an affidavit." *Lujan v. National Wildlife Fed'n*, 497 U.S. 871, 888, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990). *See also Celotex Corp.*, 477 U.S. at 324, 106 S.Ct. 2548. Summary judgment must be granted for the moving party if the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322, 106 S.Ct. 2548. *See also Abromson v. American Pac. Corp.*, 114 F.3d 898, 902 (9th Cir.1997).

In light of the facts presented by the nonmoving party, along with any undisputed facts, the Court must decide whether the moving party is entitled to judgment

---

**22.** In addition, the court in *Scallorn* applied the right to control, rather than actual control, standard for determining whether Sandia operated as an employee or an independent contractor. This Court, however, applies the actual control standard in light of explicit Ninth Circuit authority so providing. *See* Section V.C., *supra*.

as a matter of law. *See T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n,* 809 F.2d 626, 631 & n. 3 (9th Cir.1987). When deciding a motion for summary judgment, "the inferences to be drawn from the underlying facts ... must be viewed in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (citation omitted); *Valley Nat'l Bank of Ariz. v. A.E. Rouse & Co.,* 121 F.3d 1332, 1335 (9th Cir.1997). Summary judgment for the moving party in proper when a rational trier of fact would not be able to find for the nonmoving party on the claims at issue. *See Matsushita,* 475 U.S. at 587, 106 S.Ct. 1348.

### B. *Independent Contractor Exception*

■ Under the "independent contractor" exception to the FTCA's waiver of governmental immunity, the government is not liable for the negligence of its contractors. *See United States v. Orleans,* 425 U.S. 807, 813, 96 S.Ct. 1971, 48 L.Ed.2d 390 (1976). As stated above, unless the claims and relationship of the parties falls within that covered by the FTCA, this Court lacks subject matter jurisdiction to hear claims under that Act. *Borquez v. United States,* 773 F.2d 1050 (9th Cir. 1985). The FTCA subjects the United States to tort liability for the tortious conduct of an independent contractor "only if it can be shown that the government had authority to control the detailed physical performance of the contractor and exercised substantial supervision over its day-to-day activities." *Laurence v. Department of Navy,* 59 F.3d 112, 113 (9th Cir. 1995).

■ The United States contends that it may not be held liable for Caltech's allegedly negligent conduct because Caltech operated JPL's waste disposal facilities as an independent contractor. As explained above, the Court finds that the United States did not exercise day-to-day control over waste disposal operations at JPL. Accordingly, the United States may not be sued for the negligence of its independent contractor, and this Court lacks jurisdiction to hear plaintiffs' tort claims and Caltech's claims for indemnification against the United States. The United States is thus entitled to summary judgment of those claims. Plaintiffs do not claim that the United States is vicariously liable for Caltech's misconduct alleged in the Third Amended Complaint. Plaintiffs, nonetheless, would be estopped from asserting any such claims, in that plaintiffs contend that Caltech is an independent contractor of the government.

Having determined that the United States is not vicariously liable for the conduct of its independent contractor, the Court next addresses whether the discretionary function exception to the FTCA immunizes the government from liability for its own alleged misconduct.

### C. *Discretionary Function Exception*

The United States contends that it is also insulated from plaintiffs' and Caltech's claims by virtue of the discretionary function exception to the FTCA. Plaintiffs contend that the discretionary function exception does not apply here.[23]

As explained above, the FTCA provides a limited waiver of sovereign immunity for suits against the United States. Section 2680(a) of the Act, known as the "discretionary function exception" circumscribes potential liability against the United States in order to protect it from "liability that would seriously handicap efficient government operations." *See* 28 U.S.C. § 2680(a); *United States v. S.A. Empresa*

---

**23.** Caltech does not address the merits of the government's discretionary function argument. Instead, Caltech contends that the Court should not decide the discretionary function issue until it decides the independent contractor and employee certification issues. Having decided those issues, the Court proceeds to determine the applicability of the discretionary function exception.

*de Viacao Aerea Rio Grandense (Varig Airlines)*, 467 U.S. 797, 814, 104 S.Ct. 2755, 81 L.Ed.2d 660 (1984) (citation omitted). Section 2680(a) provides, in relevant part, that suits against the government are barred when they are "based upon the exercise or performance or failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a). The discretionary function exception "marks the boundary between Congress' willingness to impose tort liability upon the United States and its desire to protect certain governmental activities from exposure to suit by private individuals." *Varig*, 467 U.S. at 808, 104 S.Ct. 2755. In addition, negligence is irrelevant to a discretionary function inquiry. *Kennewick Irrigation Dist. v. United States*, 880 F.2d 1018, 1029 (9th Cir.1989).

A two step test exists to determine the applicability of the discretionary function exception. First, a court must examine the challenged conduct to determine whether it is discretionary—namely, "whether it involves an element of judgment or choice." *Berkovitz v. United States*, 486 U.S. 531, 536, 108 S.Ct. 1954, 100 L.Ed.2d 531 (1988). "Thus, the discretionary function exception will not apply when a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow." *Id.* (citations omitted). Such a statute, regulation or policy must be both specific and mandatory. *United States v. Gaubert*, 499 U.S. 315, 322, 111 S.Ct. 1267, 113 L.Ed.2d 335 (1991); *Starrett v. United States*, 847 F.2d 539, 541–42 (9th Cir.1988). "In this event, the employee has no rightful option but to adhere to the directive. And if the employee's conduct cannot appropriately be the product of judgment or choice, then there is no discretion in the conduct for the discretionary function exception to protect." *Berkovitz*, 486 U.S. at 536, 108 S.Ct. 1954.

Once the court has concluded that the challenged conduct is discretionary in nature, it must next determine "whether that judgment is of the kind that the discretionary function exception was designed to shield." *Id.* The exception "protects only governmental actions and decisions based on considerations of public policy." *Id.* at 537, 108 S.Ct. 1954 (*citing Dalehite v. United States*, 346 U.S. 15, 36, 73 S.Ct. 956, 97 L.Ed. 1427 (1953) ("Where there is room for policy judgment and decision there is discretion")). However, "the decision need not be actually grounded in policy considerations, but must be, by its nature, susceptible to a policy analysis. Where the government agent is exercising discretion, it must be presumed that the agent's acts are grounded in policy when exercising that discretion." *Miller v. United States*, 163 F.3d 591, 593–94 (9th Cir.1998) (citations and quotation omitted).

While plaintiffs bear the burden of "persuading the court that it has subject matter jurisdiction under the FTCA's general waiver of immunity," the government bears the ultimate burden of establishing the applicability of the discretionary function exception. *Prescott v. United States*, 973 F.2d 696, 701–02 (9th Cir.1992).

An analysis of the government conduct challenged by plaintiffs in this action establishes the applicability of the discretionary function exception. Plaintiffs essentially challenge: (1) the disposal of toxic waste; (2) the design of the waste disposal system; (3) the delegation of waste disposal duties to Caltech; (4) negligent supervision; and (5) failure to warn.

### 1. *Disposal of Toxic Waste*

Plaintiffs make sweeping arguments that three federal statutes, enacted years after the FTCA, (the Clean Water Act, 33 U.S.C. § 1251 *et seq.*, the Resource Conservation and Recovery Act, 42 U.S.C. § 1641 *et seq.*, and CERCLA, 42 U.S.C. § 9601 *et seq.*), as well as various Executive Orders, required the government to comply with specific mandatory federal,

state and local pollution regulations, thereby removing any governmental discretion. However, the government delegated responsibility for waste disposal at JPL, including compliance with federal, state and local laws, to its contractor, Caltech. On June 22, 1944, the government and Caltech entered into an agreement in connection with the development of Long Range Rocket Missile and Launching Equipment, Contract No. W–04–200–Ord–455. Government App., 248. Supplement No. 9 to this contract, which appears to contain the full terms of the agreement, includes Article 15 governing Plant Protection. Article 15 explains: "The Contractor shall at all times comply with all applicable local State and Federal laws[.]" *Id.* at 251. In addition, under Article 35, which outlines "General Requirements," Caltech agreed to:

> Procure all necessary permits and licenses; obey and abide by all applicable laws, regulations and ordinances and other rules of the United States of America, of the State, territory or subdivision thereof wherein the work is done, or of any other duly constituted authority.

*Id.*, p. 252. Thus, if the operations at JPL violated any of the statutes, regulations and Executive Orders set forth by plaintiffs, Caltech, rather than the government, was responsible for such conduct. Moreover, none of these statutes, regulations or orders prevented the government from delegating compliance therewith to its contractor, Caltech. Any government liability concerning the dumping of toxic waste

would thus be either vicarious liability for Caltech's actions, or tort liability for negligent supervision.[24] The FTCA, however, does not waive sovereign immunity for claims based on strict liability. *See Laird v. Nelms*, 406 U.S. 797, 802, 92 S.Ct. 1899, 32 L.Ed.2d 499 (1972). Moreover, the supervision of a contractor, even if negligent, is a discretionary function. *See* section B.4, *infra.*

### 2. Design of Waste Disposal System

The Ninth Circuit has repeatedly found claims based upon design choice to be barred by the discretionary function exception. *See Kennewick Irrigation Dist. v. United States*, 880 F.2d 1018 (9th Cir. 1989) (government's negligent design of irrigation canal); *ARA Leisure Servs. v. United States*, 831 F.2d 193, 195 (9th Cir. 1987) (government's design and construction of road without guardrails); *see also Suzanne Savary, et al. v. United States of America*, No. CV 95–7752–(E) *20 (C.D.Cal. Feb. 14, 1998) (Memorandum Opinion and Order Granting Summary Judgment),[25] *aff'd*, 205 F.3d 1352 (9th Cir. 1999) (unpublished table disposition), (discretionary function exception shielded the government from liability for plaintiffs' wrongful death claim arising from contaminated soil and water at JPL, specifically finding that design of JPL's waste disposal system was a discretionary function).

Plaintiffs contend that the discretionary function exception is not applicable to the government's design of JPL's waste

---

24. Plaintiffs also contend that Congress waived governmental immunity for violations of the Clean Water Act. Regardless of the accuracy of this assertion, however, the United States delegated responsibility for waste disposal to Caltech. Thus, any potential waiver of immunity for violations of the Clean Water Act is not relevant to the present analysis.

25. Plaintiffs filed their opposition to the government's motion for summary judgment prior to the Ninth Circuit's ruling affirming the lower court's grant of summary judgment in *Savary*. In their opposition to the government's motion for summary judgment, plaintiffs contend that Ninth Circuit Rule 36–3 prohibits this Court from considering the Magistrate Judge's memorandum opinion in *Savary*. However, nothing in Rule 36–3 prevents this Court from considering the Magistrate Judge's unpublished opinion in *Savary*. In addition, plaintiffs argue that the Court may not properly consider the Magistrate Judge's opinion in *Savary*, because the plaintiffs in that case did not identify violations of any federal statute, regulation, ordinance or manual. The Court, however, recognizes that the present case must be determined on its own record, and has done so in this case.

disposal system. Plaintiffs allege that the government allowed cesspools to be built with unmortared brick in violation of specific and mandatory Army specifications. *See* Plaintiffs' Exh. 58, p. 1471. However, the specification cited by plaintiffs does not appear to require that all cesspools be constructed entirely of mortared brick. It provides for mortared horizontal joints but also for what appear to be unmortared "open joints." *Id.* This specification thus is not specific and mandatory.

Plaintiffs also argue that the government violated the mandatory "General Safety Requirements" Army manual with respect to the handling, storage and disposal of harmful substances. Plaintiff's Exh. 50, p. 1292. Yet these "general" safety requirements also were not mandatory. "[W]here literal application of the requirement to a specific job ha[d] impractical aspects" the Army was "authorized to approve an adaptation which meets the obvious intent of the requirement." *Id.* Such a decision necessarily involves judgment and choice. *See Kennewick,* 880 F.2d at 1027 (manual's directives on designing canals not specific and mandatory, thus design decisions were discretionary); *United States v. Ure,* 225 F.2d 709 (9th Cir.1955) (design of canal project involved discretionary decisions within the discretionary function exception).

### 3. Delegation of Duties

■ In addition, the Court has found that Caltech, rather than the government, managed waste disposal operations at JPL. Plaintiffs ask the Court to take judicial notice of an Army "Manual for Control of Government Property in Possession of Non–Profit Research and Development Contractors," attached as an exhibit to the Declaration of Paul DiPong in support of Caltech's Petition for Certification. Plaintiffs claim that, according to this manual, the Government Contract Administrator was required to ensure that JPL complied with state, federal and local laws. However, no applicable statute, regulation or policy prevented the government from delegating waste disposal duties to Caltech. "The law is clear that the government may delegate its safety responsibilities to independent contractors in the absence of federal laws or policies restricting it from doing so." *Andrews v. United States,* 121 F.3d 1430, 1440 (11th Cir.1997); *see also Varig,* 467 U.S. at 820, 104 S.Ct. 2755; *Savary,* No. CV 95–7752–E at *20. Such a decision to delegate is both discretionary and susceptible of policy analysis. *Savary,* No. CV 95–7752–E at *20.

### 4. Failure to Supervise

■ Plaintiffs further argue that the government failed to enforce JPL's compliance with safety regulations. Plaintiffs cite several cases in support of this argument. These cases are distinguishable, however, in that each involved the government's failure to comply with specific directives or requirements. For instance, the court in *McMichael v. United States,* 751 F.2d 303, 306–07 (8th Cir.1985), found that government inspectors were not performing a discretionary function when they performed highly detailed fifty-one point inspections of a government contractor's compliance with safety procedures. Similarly, the court in *Aslakson v. United States,* 790 F.2d 688 (8th Cir.1986), found that the government agency's own safety policy expressly required it to adjust electrical power lines if they constituted a safety hazard, thereby removing the agency's discretion in acting or failing to act. No such precise directive required the government to supervise JPL's compliance with safety regulations. The Army "Manual for Control of Government Property in Possession of Non–Profit Research and Development Contractors," provided only general guidelines explaining that the Government Contract Administrator "shall require contractor[s] to exercise reasonable care and proper usage of all government property" and "shall require the contractor to correct all deficiencies in complying

with" its contract and the manual. DiPong Decl., Exh. E.

Furthermore, plaintiffs' claim that the government failed to ensure JPL's compliance with safety regulations is essentially a claim for negligent supervision. However, the government delegated to Caltech the responsibility for waste disposal. Any alleged government failure to supervise properly Caltech's waste disposal activities was held to be a discretionary function in *Savary*. *Savary*, No. CV 95–7752–E at *21–22. Moreover, many courts have found that the government's negligent supervision or even total failure to supervise are discretionary decisions protected by the discretionary function exception. *See, e.g., Varig*, 467 U.S. at 819–20, 104 S.Ct. 2755 ("When an agency determines the extent to which it will supervise the safety procedures of private individuals, it is exercising discretionary regulatory authority of the most basic kind."); *In re Consolidated United States Atmospheric Testing Litig.*, 820 F.2d 982, 995–96 (9th Cir.1987) (negligent failure to supervise contractor's compliance with safety procedures falls within discretionary function exception); *Kirchmann v. United States*, 8 F.3d 1273, 1276–77 (8th Cir.1993) (government's alleged failure adequately to supervise contractor's disposal of hazardous waste was policy consideration protected by the discretionary function exception); *Layton v. United States*, 984 F.2d 1496, 1502–03 (Forest Service's alleged failure adequately to supervise contractor was policy judgment protected by discretionary function exception); *Harper v. Lockheed Martin Energy Systems, Inc.*, 73 F.Supp.2d 917, 921 (E.D.Tenn.1999) (exception applied to government's allegedly negligent supervision of contractor's safety procedures).

### 5. Failure to Warn

■ Plaintiffs also contend that the government failed to warn JPL's neighbors that drinking water from the Arroyo was unsafe for human consumption. However, plaintiffs point to no directive requiring such a warning. Plaintiffs instead argue that the failure to warn is not the type of policy decision that the discretionary function exception was designed to shield.[26] Relevant case law, however, contradicts plaintiffs' argument. The court in *Savary* found that the government was immune from liability for its alleged failure to warn the public of the contaminated groundwater and soil around JPL. *Savary*, No. CV 95–7752–E at *24. The court based its decision, in part, on *In re Consolidated Litig., supra*, 820 F.2d 982, 997, where the Ninth Circuit noted that such a warning program requires "difficult judgments balancing the magnitude of the risk from radiation exposure—of which there was only fragmentary knowledge—against the risks and burdens of a public program." The court in *Savary* found that similar concerns applied to the government's decisions regarding "whether to warn, when to warn, of what possible dangers to warn, whom to warn, in what manner to warn, and what to advise in any such warning[.]" *Savary*, No. CV 95–7752–E at *24. The same policy concerns are involved in the present case, thereby rendering the government immune from suit for its alleged failure to warn. *Id.; see also Faber v. United States*, 56 F.3d 1122, (9th Cir.1995) (explaining that in safety related cases where the government allegedly failed to warn, the use of the discretionary function is limited to situations where the government was required to engage in broad policy-making judgments related to safety); *Begay v. United States*, 768 F.2d 1059, 1064–66 (9th Cir.1985) (discretionary exception applied to decision not to warn uranium miners of radiation hazards associated with their work); *Maas v. United States*, 94 F.3d 291, 297 (7th Cir.

---

**26.** This appears to be the only one of plaintiffs' claims as to which plaintiffs argue the second factor of the discretionary function test is not satisfied. Plaintiffs contest the applicability of the discretionary function exception to their other claims based on the first factor of the test.

1996) (whether to warn military service-men of exposure to radiation was discretionary decision); *Hagy v. United States,* 976 F.Supp. 1373, 1379 (W.D.Wash.1997) (decision not to warn of drug's dangers involves balancing of the importance of the activity against the risks posed by failing to warn).

Plaintiffs cite seven cases which, they argue, demonstrate that a failure to warn is not a policy decision. However, those cases are factually distinguishable. For instance, in *Summers v. United States,* 905 F.2d 1212 (9th Cir.1990), the court found that the National Park Service ("NPS") was not aware of the danger which caused plaintiff's injury. The court found that, because the NPS did not know of the hazard, it could not have engaged in "a judgment based on competing policy considerations." *Id.* at 1217. The court thus found the discretionary function exception inapplicable. *Id.* In contrast, in the present case, plaintiffs have submitted what they contend is "substantial evidence" to show that the government knew that the drinking water at the Arroyo was unsafe for human consumption.

In addition, the court in *Sutton v. United States,* 26 F.3d 903 (9th Cir.1994), held that the discretionary function exception did not apply to the Navy's failure to post adequate speed limits in an area where it had placed partially submerged obstructions to navigation. The court found that "a decision not to warn of a specific, known hazard for which the acting agency is responsible is not the kind of broader social, economic or political policy decision that the discretionary function exception is intended to protect." *Id.* at 910. Here, however, the government does not bear responsibility for warning of the potentially dangerous properties of drinking water. Moreover, the decision whether to warn the general public of contaminated water involves a balancing of public safety concerns not present in the simple decision of whether to post adequate speed limit signs.

For the reasons stated herein, the Court finds that the discretionary function exception to the government's waiver of immunity shields the government from liability for plaintiffs' tort claims based on the government's own alleged conduct. This Court, therefore, lacks subject matter jurisdiction to entertain plaintiffs' tort claims against the United States arising from the conduct, and the United States is entitled to summary judgment as to those claims.

## D. REMAINING CLAIMS

Caltech also brings claims against the United States for "implied contractual indemnity," and for declaratory relief with respect to the underlying plaintiffs' claims.

### 1. *Implied Contractual Indemnity*

Caltech's claim for implied contractual indemnity alleges that, pursuant to the contracts in effect between 1940 and the present, the government controlled waste disposal operations at JPL. Third Party Complaint ("TPC"), ¶¶ 30–31. It further alleges that, if the allegations of plaintiffs' complaint are true, then the United States negligently breached its obligations to Caltech under those contracts. *Id.,* ¶¶ 32–33. Based upon this negligent breach, Caltech seeks indemnification from the United States for any liability Caltech may incur as a result of plaintiffs' claims. *Id.,* ¶¶ 34–36.

The United States contends that the Court lacks subject matter jurisdiction over Caltech's claim for implied contractual indemnity. The government argues that Caltech asserts a contract claim which is governed by the Tucker Act. The Tucker Act waives the government's sovereign immunity for "any claim against the United States founded ... upon any express or implied contract with the United States[.]" 28 U.S.C. § 1491(a)(1). In addition, the Tucker Act invests the Court of Federal Claims with exclusive jurisdiction to hear contract claims against the United States. 28 U.S.C. § 1491. District courts are di-

vested of jurisdiction for contract claims against the United States exceeding $10,000. 28 U.S.C. § 1346(a); *North Star Alaska v. United States,* 14 F.3d 36, 37 (9th Cir.1994).

Caltech requests that the Court defer ruling on this claim as irrelevant to a determination of Caltech's petition for certification. Alternatively, Caltech briefly argues that its claim for implied contractual indemnity seeks indemnification for the government's negligent performance of its contractual obligations and thus sounds in tort, not contract, and is properly brought under the FTCA.

At the present stage in this litigation, however, there has been no finding that Caltech is liable to plaintiffs. Caltech's claim for contractual indemnity is therefore premature and not ripe for adjudication. *See Clinton v. Acequia,* 94 F.3d 568, 572 (9th Cir.1996) ("a case is not ripe where the existence of the dispute itself hangs on future contingencies that may or may not occur"). Accordingly, the Court dismisses that claim without prejudice.

#### 2. *Declaratory Relief*

Caltech's claim for declaratory relief seeks:

> a judicial determination of the respective rights and duties of Caltech and the United States with respect to the damages claimed in the Complaint of Plaintiffs herein. In particular, Caltech desires a declaration of the comparative liability of Caltech and the United States for these damages, and a declaration of the United States' responsibility for indemnity or contribution to Caltech for any sums that Caltech may be compelled to pay and for which the United States is determined responsible, entirely or in part.

TPC, ¶ 39. The United States contends that the FTCA does not waive sovereign immunity for claims seeking declaratory relief, and that Caltech is not entitled to indemnification from the government.

Caltech again requests that the Court defer ruling on this claim as irrelevant to Caltech's petition for certification. Caltech also argues that it may bring a claim under the FTCA for declaratory relief incidental to a tort claim for which the government has waived sovereign immunity.

As explained above, Caltech has not been found liable to plaintiffs on any of their claims. In general, "declaratory judgment actions are justiciable if there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Eureka Federal Sav. and Loan Association v. American Cas. Co.,* 873 F.2d 229, 231 (9th Cir.1989) (quotation omitted). The Court finds that no justiciable case or controversy presently exists with respect to Caltech's claim for declaratory relief. Accordingly, the Court dismisses that claim without prejudice.

### VII. CONCLUSION

For all the reasons stated herein, Caltech's petition for certification is denied, and the United States' motion for summary judgment of plaintiffs' and Caltech's claims is granted. As a result, only plaintiffs' state law claims against Caltech remain in this action. There being no other basis for federal jurisdiction, the Court declines to exercise its discretion to exercise supplemental jurisdiction over those claims. Plaintiffs' claims against Caltech are therefore remanded to Los Angeles County Superior Court.